A03A0906. RANDOLPH v. THE STATE.
(590 SE2d 834)

RUFFIN, Presiding Judge.

This case addresses the critical issue of the authority of police officers to conduct a warrantless search of a marital residence when, after one spouse refuses, the other spouse grants consent to search the home. Does the latter's consent supersede the first spouse's objection? The trial court concluded that it did, and it denied a motion to suppress. For reasons that follow, we disagree with the trial court and thus reverse.

The material facts are not in dispute. Scott Randolph and his wife were having marital problems and separated in late May 2001. Mrs. Randolph took a great deal of her clothing and went with their son to her parents' home in Canada. Mr. Randolph continued to reside at the marital residence in Americus, Georgia. On or about July 4, 2001, Mrs. Randolph and the child returned to their house in Americus.

On July 6, 2001, Mrs. Randolph reported a domestic disturbance, and the police responded at around 9:00 a.m. When the officers arrived, Mrs. Randolph appeared very upset and complained that her husband had taken their child away from the house. She also accused Mr. Randolph of using large amounts of cocaine, thereby causing financial problems for the family. Shortly thereafter, Mr. Randolph returned to the house without the child. He explained that he had taken the child to a neighbor's house because he was concerned that his wife was going to leave the country with the child again. He also accused his wife of being highly inebriated and an alcoholic. Sergeant Brett Murray accompanied Mrs. Randolph to the neighbor's house to retrieve the child.

After they returned to the Randolph residence, Murray confronted Mr. Randolph about his wife's allegations concerning his cocaine use and asked for consent to search the residence. When Mr. Randolph responded with an unequivocal "no," Murray turned to Mrs. Randolph and asked for her consent. Readily agreeing to the search, Mrs. Randolph took Murray to an upstairs bedroom. Peering in the doorway, the officer observed a "piece of cut straw" on a dresser

in the room. Upon closer examination, the officer observed some white residue on the straw, which he believed had been used for ingesting cocaine.

Murray collected an evidence bag and called the district attorney's office. Upon reaching the district attorney's office, he was instructed to stop the search and obtain a warrant. Mrs. Randolph then informed him that she was withdrawing her consent to search the house.

Murray, accompanied by the Randolphs, then took the straw and residue to the police station and obtained a warrant to search the house. During the ensuing search, numerous drug-related items were seized. Ultimately, an indictment was returned charging Mr. Randolph with possession of cocaine. He moved to suppress evidence of the drugs, claiming that search of the residence over his express objection violated his Fourth Amendment rights. The trial court denied the motion, and we granted Mr. Randolph's application for interlocutory appeal.

1. It is well established that "the consent of one who possesses common authority over premises or effects is valid as against the absent nonconsenting person with whom that authority is shared."[1] This is so because it is *reasonable* to expect that a co-habitant with the authority to give such consent might, in fact, exercise that authority.[2] And the touchstone of Fourth Amendment jurisprudence is reasonableness.[3]

We are now presented with the question of whether it is reasonable for one occupant to believe that his stated desire for privacy will be honored, even if there is another occupant who could consent to a search. Notably, neither our Supreme Court nor the United States Supreme Court has addressed the precise issue before us, although *United States v. Matlock*[4] is exceedingly close. However, at least one jurisdiction has concluded that it is reasonable for an occupant to believe his wishes will be honored as, " 'ordinarily, persons with equal rights in a place would accommodate each other by not admitting persons over another's objection while he was present.' "[5] Indeed, if one person with equal rights in a place refuses to honor a co-occupant's objection, such refusal hints of underlying trouble in the relationship and should raise a question as to why consent was given.[6] Accordingly, we find this reasoning persuasive.

---

[1] *United States v. Matlock*, 415 U. S. 164, 170 (94 SC 988, 39 LE2d 242) (1974).

[2] Id. at 171, n. 7.

[3] See *Padron v. State*, 254 Ga. App. 265, 268 (1) (562 SE2d 244) (2002).

[4] Supra.

[5] (Punctuation omitted.) *State v. Leach*, 113 Wash.2d 735, 739-741 (782 P2d 1035) (1989) (quoting 3 W. LaFave, Search and Seizure).

[6] The facts of this case illustrate the problem with dueling responses to a request for consent to search. The Randolphs were clearly at odds, hurling accusations of wrongdoing at

Moreover, we find it inherently reasonable that police honor a present occupant's express objection to a search of his dwelling, shared or otherwise. One who grants consent to search may subsequently withdraw such consent, thereby terminating law enforcement officers' authority to search.[7] Inherent in the power to grant consent is the power to vitiate that consent. Who, then, may terminate the search? Is it limited to the consenting co-occupant? Or, may an objecting co-occupant exercise his competing right to be free from the search? We believe the answer to this last question is an unequivocal "yes." If "common authority" is the basis for allowing one co-occupant to consent to a search on behalf of all occupants, it seems reasonable that "common authority" should permit a co-occupant to exercise privacy rights on behalf of all occupants.

Such result is particularly reasonable in this case, which also involves a marital dispute. When possible, Georgia courts strive to promote the sanctity of marriage and to avoid circumstances that create adversity between spouses.[8] Allowing a wife's consent to search to override her husband's previous assertion of his right to privacy threatens domestic tranquility.[9]

In resolving this issue, Judge Phipps' special concurrence favors a case-by-case analysis. However, it is incumbent upon this Court to provide as much guidance as practicable to those officers confronted with the daily task of balancing citizens' Fourth Amendment privacy interests against the officers' duty to investigate crime. And a bright-line rule requiring police to obtain a warrant in the face of competing responses to requests for consent provides a clear guideline for law enforcement. Such rule should not unduly hamper law enforcement, as generally a warrant is the rule rather than the exception.

The cases the special concurrence cites to support a case-by-case analysis are not persuasive. In several of those cases, the victim was in imminent danger, and the exigent circumstances exception likely would permit a warrantless search.[10] And if there is no imminent

---

one another. Thus Mrs. Randolph's motive for consenting to the search in the face of her husband's refusal is troubling. Under these circumstances, it is preferable that a neutral magistrate determine whether Mrs. Randolph's accusations were founded or whether they stemmed from the ongoing altercation.

[7] See *Montero v. State*, 245 Ga. App. 181, 184 (537 SE2d 429) (2000) (defendant "was as free to withdraw his consent to search . . . as he was not to give such consent in the first place").

[8] See *Robeson v. Intl. Indem. Co.*, 248 Ga. 306, 308-309 (3) (282 SE2d 896) (1981) (policy rationale supporting interspousal tort immunity doctrine).

[9] Granted, the Randolphs appear to have a dearth of marital harmony. However, the fact that Mrs. Randolph subsequently withdrew her consent to search suggests that the relationship may not have been entirely acrimonious.

[10] See *Lawler v. State*, 276 Ga. 229, 233 (4) (b) (576 SE2d 841) (2003) ("[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal").

danger, a law enforcement officer should be required to obtain a warrant.

The dissent, with verbal ease, but without verbal economy, is not persuasive either. Although the dissent accuses the Court of misconstruing *Matlock* and "conflat[ing] two factors" in Fourth Amendment jurisprudence — an individual's waiver of privacy and the subsequent effect of such waiver — such is not so. To the contrary, it is the dissent that has misconstrued *Matlock*, expanding it in a manner that is inconsistent with the Fourth Amendment. This case is both legally and factually distinguishable from *Matlock*.[11] Here, Mr. Randolph was not only present, but he affirmatively exercised his Fourth Amendment right to be free from police intrusion by refusing to consent to the search of his house. We should first assess the right asserted before concluding that the right has been waived.

According to our interpretation — one that is consistent with Fourth Amendment principles — *Matlock* and its progeny stand for the proposition that, in the absence of evidence to the contrary, there is a presumption that a co-occupant has waived his right of privacy as to other co-occupants. However, when police are confronted with an unequivocal assertion of that co-occupant's Fourth Amendment right, such presumption cannot stand. After all, the right involved is the right to be free from police intrusion, not the right to invite police into one's home. Thus, the issue is not Mrs. Randolph's right to consent to a search, but whether she may waive her husband's right to be free from the search. Given Mr. Randolph's unequivocal assertion of that right, it seems disingenuous to conclude that he waived it.

We are not the first Court to reach this result, despite the dissent's suggestion to the contrary.[12] As artfully stated by a Florida court,

> if the Fourth Amendment means anything, it means that the police may not undertake a warrantless search of defendant's property after he has expressly denied his consent to such a search. Constitutional rights may not be

---

[11] Furthermore, I am unpersuaded that we are bound in this case by federal law. Randolph raised both federal and Georgia constitutional grounds in his motion to suppress. Assuming, for the sake of argument, that federal law dictates the result advocated by the dissent, it does not automatically follow that Georgia law requires the same result. See *Powell v. State*, 270 Ga. 327, 330 (3) (510 SE2d 18) (1998) ("the 'right to be let alone' guaranteed by the Georgia Constitution is *far more extensive* tha[n] the right of privacy protected by the U. S. Constitution") (emphasis supplied).

[12] See *Leach*, supra; *Silva v. State*, 344 S2d 559 (Fla. 1977); *Smith v. State*, 465 S2d 603 (Fla. App. 1985); *In the Matter of the Welfare of D. A. G.*, 484 NW2d 787 (Minn. 1992) (although several of these cases have been questioned, legal research shows that the cases retain precedential value. Moreover, the cases serve to illustrate that there is, in fact, a split of authority as to how *Matlock* should be interpreted).

defeated by the expedient of soliciting several persons successively until the sought-after consent is obtained.[13]

Nonetheless, the dissent's position has its allure: if a co-occupant has assumed the risk that another co-occupant will permit a search of an area, he no longer has a reasonable expectation of privacy in that area. But the risk assumed by a co-occupant is that, in the absence of evidence to the contrary, the other co-occupant might grant consent to search.[14]

The dissent, passionate it its quest, poignant in its resolve, and even practicable in its approach, peers myopically at the problem presented. This Court should not read the Fourth Amendment from a perspective of impoverishment, but from the vantage point of proper respect for a fundamental right. The type of seemingly innocuous encroachment advocated by the dissent is that which the United States Supreme Court alluded to when it wrote:

It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.[15]

Given our charge to construe the Fourth Amendment expansively, we conclude that Mr. Randolph's exercise of his Fourth Amendment right should be honored.

2. On appeal, the State argues that even if Mrs. Randolph lacked authority to consent, the search was nonetheless valid. Citing *Illinois v. Rodriguez*,[16] the State contends that the search was permissible because the police had a good faith belief that Mrs. Randolph had authority.

In *Illinois v. Rodriguez*, the defendant had severely beaten his girlfriend. She went to her mother's home and summoned the police.

---

[13] (Punctuation omitted.) *Lawton v. State*, 320 S2d 463, 465 (Fla. App. 1975).

[14] See *Matlock*, supra at 170.

[15] (Punctuation omitted.) *Coolidge v. New Hampshire*, 403 U. S. 443, 454 (91 SC 2022, 29 LE2d 564) (1971).

[16] 497 U. S. 177 (110 SC 2793, 111 LE2d 148) (1990).

She then took the police to the defendant's apartment, told them that she lived there with him, unlocked the door with a key, and gave them permission to enter. Unbeknownst to the police, the girlfriend had in fact moved out of the apartment several weeks earlier. The Supreme Court nonetheless held the warrantless entry valid, because it was based upon the consent of a third party whom the police reasonably believed to possess common authority over the premises. *Rodriguez* is distinguishable, because the police here knew the facts before conducting the search.

Although the United States Supreme Court adopted a "good faith" exception to the exclusionary rule of the Fourth Amendment in *United States v. Leon*,[17] the Supreme Court of Georgia later concluded in *Gary v. State*[18] that in Georgia a defendant's statutory right to exclusion of evidence has no "good faith" exception. Therefore, consistent with both *Rodriguez* and *Gary*, we must determine the validity of the search based on the facts known to the officer at the time of the search. If we conclude from those facts that the search was not valid, we cannot uphold it on grounds that, under the facts, the officer may have drawn a good faith legal conclusion contrary to our own.

3. The State also argues that even if the warrantless search was invalid, the evidence was admissible under either the "independent source" exception or the "inevitable discovery" exception to the exclusionary rule.

The independent source doctrine stems from *Murray v. United States*.[19] In that case, several law enforcement agents conducted an illegal search of a warehouse and observed but did not seize evidence that was in plain view. The agents later obtained a warrant to search the warehouse. In obtaining the warrant, they neither mentioned the prior illegal entry nor relied on any observations made during the entry. In execution of the warrant, the agents then seized the evidence they had observed earlier. The Supreme Court held that suppression of the evidence was not required if the government could establish that the warrant was in fact a genuinely independent source for its discovery.[20] *Murray* is distinguishable because the State has not shown that it established probable cause for issuance of the warrant in this case independently of facts revealed by the unlawful search. "The admissibility of [evidence] under the 'independent source' exception depends on whether authorities established probable cause to seize the [evidence], either before or after the illegal

---

[17] 468 U. S. 897 (104 SC 3405, 82 LE2d 677) (1984).
[18] 262 Ga. 573 (422 SE2d 426) (1992).
[19] 487 U. S. 533 (108 SC 2529, 101 LE2d 472) (1988).
[20] *Price v. State*, 270 Ga. 619, 622-623 (2) (513 SE2d 483) (1999).

search, independent of any facts revealed by the unlawful search. [Cits.]"[21]

Under the inevitable discovery doctrine, the State must show (1) that evidence derived from police error or illegality would have been ultimately or inevitably discovered by lawful means, and (2) that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct.[22] Given the State's failure to show that the evidence would have ultimately been discovered, this argument lacks merit.

*Judgment reversed. Smith, C. J., Miller and Ellington, JJ., concur and concur specially. Phipps, J., concurs specially. Andrews, P. J., and Blackburn, P. J., dissent.*

ELLINGTON, Judge, concurring specially.

I concur fully in the majority opinion. As illustrated by the several opinions in this case, this is an unsettled area of the law in Georgia and across the nation. Like the majority, I favor the adoption of a bright-line rule precluding police officers from conducting a warrantless search if any co-occupant of the premises at issue is present and communicates an objection to the officers. I write separately to add that I believe such a rule is necessary to protect the right to privacy while at the same time giving clear direction to law enforcement. I believe the right to privacy demands that, in close calls, we adhere closely to the general principle that warrantless searches are per se unreasonable and unconstitutional. Exigency and consent, as exceptions to this general rule, should be drawn as narrowly as possible. When one co-occupant consents, the law allows police officers to presume all other (absent or silent) co-occupants had no expectation of privacy. But where a co-occupant is present and objecting, any *presumption* of a lack of an expectation of privacy should yield to that affirmative *assertion* of the right to be free of warrantless searches. I believe we unreasonably burden law enforcement officers when we require them to stake the later admissibility of any evidence seized on their ability to immediately and fully divine a consenter's relationship to the premises and to the objecting co-occupant as well as the consenter's motives in giving consent to search.

I am authorized to state that Chief Judge Smith and Judge Miller join in this special concurrence.

PHIPPS, Judge, concurring specially.

Although I wholeheartedly agree with the reversal of the trial court's denial of Randolph's motion to suppress, I think that the

---

[21] *Waldrip v. State*, 267 Ga. 739, 750-751 (18) (482 SE2d 299) (1997).
[22] *Taylor v. State*, 274 Ga. 269, 274 (3) (553 SE2d 598) (2001).

bright-line approach adopted by the majority misconstrues the guiding decision of the United States Supreme Court in *United States v. Matlock*,[23] loses sight of the overall reasonableness requirement of the Fourth Amendment, is not required in order to provide reasonably clear guidance to law enforcement, and holds the potential for unduly hampering police.

1. "The Fourth Amendment to the United States Constitution protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures' and requires that search warrants be supported by probable cause."[24]

I cannot agree with the bright-line rule adopted by the majority, primarily because

> [t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. The determination of fourth-amendment reasonableness requires consideration of the totality of circumstances in a particular case, weighing all of the factors suggesting constitutional violation against all of those indicating validity.[25]

In *United States v. Matlock*,[26] the defendant jointly occupied a residence with a woman. The police arrested the defendant in the front yard without asking him for permission to search the residence. Instead, the police asked his housemate and she consented. Holding the one joint occupant's voluntary consent to search the premises to be valid against the co-occupant, the Supreme Court in *Matlock* crafted the following rule:

> [W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.[27]

---

[23] 415 U. S. 164 (94 SC 988, 39 LE2d 242) (1974).

[24] *Stanford v. State*, 251 Ga. App. 87, 89 (1) (553 SE2d 622) (2001).

[25] (Citations and punctuation omitted.) *City of East Point v. Smith*, 258 Ga. 111, 112 (1) (365 SE2d 432) (1988).

[26] Supra.

[27] Id. at 171; *Atkins v. State*, 254 Ga. 641, 642 (331 SE2d 597) (1985).

In a footnote, the Court then explained that

> [c]ommon authority is . . . not to be implied from the mere property interest a third party has in the property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.[28]

The majority interprets *Matlock* as standing "for the proposition that, in the absence of evidence to the contrary, there is a presumption that a co-occupant has waived his right of privacy as to other co-occupants." *Matlock*, however, by its express terms holds that co-occupants have "assumed the risk" that one of their number might permit the common area to be searched. *Matlock* says nothing whatsoever about any "presumed" waiver of privacy as to other co-occupants. I would think that the presumption would be that an individual who has probably committed a crime would not consent to a search of his property. Moreover, it would seem that if the Court in *Matlock* had intended to give a present co-occupant an automatic veto over another co-occupant's consent, as held by the majority, it would have required the police to ask the defendant in that case whether he objected to the search.

In reliance on a line of cases exemplified by *May v. State*[29] and *State v. Gonzalez-Valle*,[30] Randolph asks us to establish the bright-line rule which the majority has adopted. In support of another bright-line rule allowing one occupant to give a valid consent to a search of jointly occupied or controlled property even where the other occupant refuses to consent or objects to the search, the State cites such cases as *People v. Sanders*,[31] *City of Laramie v. Hysong*,[32] *United States v. McAlpine*,[33] and *People v. Haskett*.[34]

I cannot agree with either extreme. A broad rule precluding the police from conducting a warrantless search if both spouses or co-occupants are present and one objects is premised on a reading of the Fourth Amendment as prohibiting police from undertaking a war-

---

[28] *Matlock*, supra at 171, n. 7; *Smith v. State*, 264 Ga. 87, 88 (2) (441 SE2d 241) (1994); see *State v. West*, 237 Ga. App. 185 (514 SE2d 257) (1999).

[29] 780 SW2d 866 (Tex. App. 1989).

[30] 385 S2d 681 (Fla. App. 1980).

[31] 904 P2d 1311 (Colo. 1995).

[32] 808 P2d 199 (Wyo. 1991).

[33] 919 F2d 1461 (10th Cir. 1990).

[34] 30 Cal.3d 841 (640 P2d 776) (1982).

rantless search of a person's property if such person expressly denies his consent to such a search.[35] This, in my opinion, is a misinterpretation of the constitutional text. By its terms, the Fourth Amendment does not require a warrant to search premises in the absence of consent. Rather, what the Fourth Amendment requires is that warrants be supported by probable cause. What the Fourth Amendment prohibits is unreasonable searches.

A bright-line rule requiring the police to obtain a warrant anytime a spouse or co-occupant is present on the premises and voices an objection to the search loses sight of the overall reasonableness requirement of the Fourth Amendment and might have precluded the search in a case like *Sanders*. In that case, a woman complained that during an argument with the man with whom she lived, he had physically assaulted her, threatened to kill her, and fired a rifle into the back window of her truck as she fled. She showed the police the truck, told them they might find the defendant at their home, and gave her consent to a search of the home. The court held that the fact that the defendant was present when the police searched the residence and did not consent to the search did not vitiate the absent co-occupant's consent. I agree with *Sanders*, for reasons given in *McAlpine*. In *McAlpine*, police received a telephone call from a woman who reported that she was being held against her will and threatened with guns by two men who had been sexually assaulting her. The responding officers went to the residence and were admitted by the woman. She told one of the officers that she regularly slept in one of the bedrooms and had personal property scattered throughout the residence. The court held that the woman was qualified to give effective consent to search the premises, holding that crime victims who cohabit with their abusers are entitled to give consent to a search in their own rights.

In *Hysong*, the husband was a suspect in a recently reported incident of child abuse outside the home. When a police officer arrived at his house, his wife let them enter and check the child's condition over her husband's objection. Under those "exigent circumstances,"[36] the officer's warrantless entry into the house with the consent of one spouse was properly held legal even though the other spouse was present and objected. In *Haskett*, police arrested the defendant at his home after his sister reported that he had raped and stabbed her, and murdered her two sons, at her home. The defendant's wife consented to the officers' request that they be allowed to enter the house. According to the defendant, one of the officers asked

---

[35] See *Lawton v. State*, 320 S2d 463, 465 (Fla. App. 1975).
[36] *Hysong*, supra at 204-205.

for his consent, but he refused to give it. Although the "exigent circumstances" exception to the Fourth Amendment's warrant requirement was not applicable in *Haskett*, the court properly refused to adopt a rule vitiating the consent of one co-occupant when the other is present and protests the entry or search where the police officers had fresh evidence that the defendant had committed several violent crimes.

Although I, therefore, must reject the bright-line rule suggested by Randolph and adopted by the majority, I similarly cannot agree with an unqualified rule, such as that urged by the State, allowing one spouse or occupant to give a valid consent to a search of jointly occupied premises even though the other objects. In *May*, after the defendant's wife moved out of their residence but before their divorce, she arranged for the police to gain entry to the home and search it while the defendant was away. Under those facts, the court held that although the wife retained a community property interest in the residence and a key to it, she had no right to consent to a warrantless search of the house because her husband's personal privacy interest was superior to her property interest. Similarly, in *Gonzalez-Valle*, a husband and wife were having marital difficulties, and she was angry and jealous over his affair with another woman. As a result, she informed the police that her husband had a gun and some narcotics in his possession. She met them at her home and consented to a warrantless search of the bedroom occupied by her husband. Under those circumstances, the court held that the wife had no right to waive her husband's protection against unreasonable searches and seizures.

This case is closer to *May* and *Gonzalez-Valle* than to *Sanders*, *Hysong*, *McAlpine*, and *Haskett*. Here, the wife summoned the police to the marital residence because, upon her return after being separated from her husband, he had spirited their child away. Her complaint was resolved when the child was safely returned to the residence. At that point, the police were faced with cross-accusations by bickering spouses. According to the husband, the wife was under the influence of alcohol. According to the wife, the husband was using illegal drugs. Testimony given by Sergeant Murray indicated that he could verify neither accusation. Consequently, the officer had no hard evidence that a crime had even been committed. Under those circumstances, the matter should have been submitted to a neutral and detached magistrate for a probable cause determination before the police searched Randolph's house over his objection.

The case-by-case analysis I propose provides the police with reasonably clear guidance. If there is some objective verification that a crime has been committed, the police may search the common areas of a residence with the consent of one occupant or spouse even if

another co-occupant or spouse objects. If one co-occupant or spouse simply summons the police to a residence and accuses his or her co-occupant or spouse of illegal conduct, the matter should be submitted to a neutral and detached magistrate if another co-occupant or spouse is present on the premises and objects. As always, in cases of doubt and in the absence of exigent circumstances, a warrant should be obtained.

In denying Randolph's motion to suppress, the trial court relied on *Kendrick v. State*.[37] In *Kendrick*, detectives were called to the scene of a robbery shortly after its occurrence and viewed a videotape of it. The detectives' investigation then led them to the defendant's house. They were admitted by his wife. When they encountered the defendant in the house, they recognized him as the robber depicted in the videotape. After questioning him, they arrested him. The defendant contended that the detectives' presence in his house at the time of his arrest was illegal because he had told them to leave. We held that the defendant was legally arrested during an entry into his home pursuant to the consent of his wife, who shared the house with him and thus had common authority over it. We found that the defendant, in fact, had not told the detectives to leave and that, in any event, only his wife could revoke her consent.

In *Kendrick*, the police were thus involved in the investigation of a robbery when events were fresh, and they entered the defendant's house with his wife's permission without objection by him and acquired probable cause for an arrest immediately upon seeing him. For these reasons, *Kendrick* is distinguishable from this case. *Matlock* is controlling and, in my opinion, supports the conclusion that in this case the consent to the search by the one spouse was not valid against the objection of the other spouse who was also present on the premises.

2. Although I cannot agree with much of what is said in Division 1 of the majority opinion, I find the reasoning employed in Divisions 2 and 3 compelling, and I fully concur in those holdings.

BLACKBURN, Presiding Judge, dissenting.

Despite the binding authority of the United States Supreme Court's holding in *United States v. Matlock*,[38] and the persuasive authority of our federal courts interpreting *Matlock*, both the majority opinion and the special concurrences establish a contrary rule for Fourth Amendment issues in Georgia regarding consent searches to that established by the United States Supreme Court.

This Court, however, has no authority to either ignore or modify

---

[37] 211 Ga. App. 599, 600 (2) (440 SE2d 53) (1993).
[38] *United States v. Matlock*, 415 U. S. 164 (94 SC 988, 39 LE2d 242) (1974).

holdings of the United States Supreme Court regarding the interpretation of the Fourth Amendment of our Federal Constitution. This Court also lacks authority to create new search and seizure laws more restrictive of police activity than those issued by the United States Supreme Court, as that power is reserved for the Supreme Court of Georgia through interpretation of our State Constitution or the Georgia Legislature through passage of constitutional statutory law. This Court is not an arbiter of public policy, but a tribunal of laws bound by precedent. Because the majority and special concurrence in this case either misconstrue controlling precedent or exceed this Court's authority, I must respectfully dissent.

The present case is controlled by *Matlock*, which stands for the proposition "that if the state can establish that the third party shares an area with another more or less equally, that party's consent authorizes a search of the entire area regardless of the other person's proximity to, agreement with, or relationship with the third party." Whitebread and Slobogin, Criminal Procedure: An Analysis of Cases and Concepts 288 (4th ed. 2000). *"Matlock's* third-party consent rule applies even when a present subject of the search objects." *Lenz v. Winburn.*[39]

Here, the defendant's wife, with whom he shared his home equally, consented to a search of the home while the defendant, who was present, objected thereto. *Matlock* involved a consent to search given by Matlock's girlfriend, who was a co-occupant, while Matlock, who was present on the premises, was not asked for a consent to search. The United States Supreme Court approved the search, despite Matlock's presence. Under *Matlock*, the search here was proper, whether or not the defendant was present or objected to his wife's consent to the search.

This Court is absolutely bound to follow precedent set by the United States Supreme Court on federal constitutional questions. This case involves search and seizure issues under the Fourth Amendment. This Court cannot establish a more restrictive view of Fourth Amendment search and seizure law grounded in public policy aspirations. Where the Georgia Constitution or an act of the Georgia Legislature provides greater protections for our citizens than does the Federal Constitution, Georgia is free to apply such standard where there is no reliance on the Federal Constitution or United States Supreme Court precedent, which circumstances are not applicable here.

This limitation on our power is evident from the standards

---

[39] *Lenz v. Winburn*, 51 F3d 1540, 1548 (11th Cir. 1995).

adopted by the United States Supreme Court in determining whether it might have jurisdiction over a case.

> Under *Michigan v. Long*,[40] when "a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground [are] not clear from the face of the opinion, [the United States Supreme Court] will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so." Id. at 1040-1041.

(Footnote omitted.) *Ohio v. Robinette*.[41]

There is no question that this case relies directly and inextricably on federal law. Even those Georgia cases cited by the majority and special concurrence in reaching their conclusions explicitly cite precedent from the United States Supreme Court as the basis for their holdings. Furthermore, neither the majority nor the special concurrence has cited any source of state legal authority under our constitution, case law, or statute, which would allow them to set forth the rule they now wish to enforce.

In the absence of such authority, this Court simply has no power to ignore the facts and holding of *Matlock*. We cannot unilaterally impose greater restrictions on police activity than those held by the United States Supreme Court to be necessary under federal standards unless we can unequivocally base our opinion either on a decision by our state Supreme Court so interpreting our State Constitution or a statute enacted by our legislature, which is not unconstitutional. See, e.g., OCGA § 17-5-30 (no good faith exception to the exclusionary rule in Georgia). The majority and special concurrence cite no such authority. In addition to failing to follow binding federal precedent, the holdings of the majority and special concurrence in establishing their new standard usurp the authority of both our state Supreme Court and our legislature. Such a holding oversteps this Court's bounds.

Turning to the substance of the case now before us, the hallmark of Fourth Amendment jurisprudence is protection from *unreasonable* and *arbitrary* searches and seizures by the State. If a police officer has been informed by one occupant of a particular premises that his or her co-occupant has committed a crime inside and explicitly gives the officer permission to search the premises, it cannot be said that

---

[40] *Michigan v. Long*, 463 U. S. 1032 (103 SC 3469, 77 LE2d 1201) (1983).
[41] *Ohio v. Robinette*, 519 U. S. 33, 37 (117 SC 417, 136 LE2d 347) (1996).

the officer acts *unreasonably* or *arbitrarily* in conducting a search based on this consent, even if the co-occupant is present and objects to the search.

In turn, the application of the Fourth Amendment to cases involving the consent of a third-party co-occupant to search shared property is based on the idea that, by sharing property, one may waive his expectation of privacy with regard to the shared property and assume the risk that any person sharing dominion over it may, *in his own right*, allow a search of that property, unless and until such time as the property is no longer shared and the waiver of privacy rights has thereby been explicitly withdrawn. See, e.g., *United States v. Morning*;[42] *United States v. Flores*.[43]

In this case, the police officers acted reasonably in searching the premises in question after the defendant's wife informed them of a crime being committed and then consented to the search. Because the defendant shared dominion over the property with his wife at the time consent was given by her, the waiver of his expectation of privacy with regard to the premises remained in effect. With his expectation of privacy still waived with regard to his wife, the defendant had no right to trump her consent to search their home. Id.

A detailed consideration of the facts of *Matlock* directly informs our decision here.

> Matlock was indicted in February 1971 for the robbery of a federally insured bank in Wisconsin, in violation of 18 U.S.C. § 2113. A week later, he filed a motion to suppress evidence seized by law enforcement officers from a home in the town of Pardeeville, Wisconsin, in which he had been living. Suppression hearings followed. As found by the District Court, the facts were that respondent was arrested *in the yard in front of the Pardeeville home* on November 12, 1970. The home was leased from the owner by Mr. and Mrs. Marshall. Living in the home were Mrs. Marshall, several of her children, including her daughter Mrs. Gayle Graff, Gayle's three-year-old son, and respondent. *Although the officers were aware at the time of the arrest that respondent lived in the house, they did not ask him which room he occupied or whether he would consent to a search.* Three of the arresting officers went to the door of the house and were admitted by Mrs. Graff, who was dressed in a robe and was holding her son in her arms. The officers told her they were looking for money and a gun and asked if they could search the house.

[42] *United States v. Morning*, 64 F3d 531, 536 (B) (9th Cir. 1995).
[43] *United States v. Flores*, 172 F3d 695, 698 (A) (9th Cir. 1999).

Although denied by Mrs. Graff at the suppression hearings, it was found that she consented voluntarily to the search of the house, including the east bedroom on the second floor which she said was jointly occupied by Matlock and herself. The east bedroom was searched and the evidence at issue here, $4,995 in cash, was found in a diaper bag in the only closet in the room. The issue came to be whether Mrs. Graff's relationship to the east bedroom was sufficient to make her consent to the search valid against respondent Matlock.

(Footnote omitted; emphasis supplied.) *Matlock*, supra at 166-167.

In order to answer this question, the Supreme Court first canvassed the law regarding third-party consents to search as it had developed in a number of federal district courts around the country. The Supreme Court summarized:

It has been assumed by the parties and the courts below that the voluntary consent of any joint occupant of a residence to search the premises jointly occupied is valid against the co-occupant, permitting evidence discovered in the search to be used against him at a criminal trial. This basic proposition was accepted by the Seventh Circuit in this case, as it had been in prior cases, and has generally been applied in similar circumstances by other courts of appeals, and various state courts. This Court left open, in *Amos v. United States*,[44] the question whether [a] wife's permission to search the residence in which she lived with her husband could "waive his constitutional rights," but more recent authority here clearly indicates that the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared. In *Frazier v. Cupp*,[45] the Court "dismissed rather quickly" the contention that the consent of the petitioner's cousin to the search of a duffel bag, which was being used jointly by both men and had been left in the cousin's home, would not justify the seizure of petitioner's clothing found inside; joint use of the bag rendered the cousin's authority to consent to its search clear. Indeed, the Court was unwilling to engage in the "metaphysical subtleties" raised by Frazier's claim that his cousin only had permission to use one compartment within the bag. By allowing

[44] *Amos v. United States*, 255 U. S. 313, 317 (41 SC 266, 65 LE 654) (1921).
[45] *Frazier v. Cupp*, 394 U. S. 731, 740 (89 SC 1420, 22 LE2d 684) (1969).

the cousin the use of the bag, and by leaving it in his house, Frazier was held to have assumed the risk that his cousin would allow someone else to look inside. Ibid. More generally, in *Schneckloth v. Bustamonte*,[46] we noted that our prior recognition of the constitutional validity of "third party consent" searches in cases like *Frazier* and *Coolidge v. New Hampshire*[47] supported the view that a consent search is fundamentally different in nature from the waiver of a trial right. *These cases at least make clear that when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.* The issue now before us is whether the Government made the requisite showing in this case.

(Citation and footnotes omitted; emphasis supplied.) *Matlock*, supra at 169-172.

Expounding on the emphasized language above, the Supreme Court clarified:

The authority which justifies the third-party consent . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection *in his own right* and that *the others have assumed the risk that one of their number might permit the common area to be searched.*

(Emphasis supplied.) *Matlock*, supra at 171, n. 7.

Based on these conclusions of law, the Supreme Court, after finding that Matlock's girlfriend did indeed have equal dominion and control over the house and the bedroom, ruled that the search and seizure in that case were acceptable. And, the Supreme Court reached this conclusion despite the fact that, at the time that police asked Matlock's girlfriend for permission to search, Matlock was *present* and standing just in the front yard, and *the officers knew that Matlock was an occupant of the house but chose not to ask him for permission to search.* Clearly, the logical basis for this conclusion was just as the Supreme Court explicitly stated in the case: any co-

---

[46] *Schneckloth v. Bustamonte*, 412 U. S. 218 (93 SC 2041, 36 LE2d 854) (1973).
[47] *Coolidge v. New Hampshire*, 403 U. S. 443, 487-490 (91 SC 2022, 29 LE2d 564) (1971).

habitant has the right to permit the inspection of shared property *in his own right* based on his relationship to the premises or effects sought to be inspected, and the presence or absence of any other cohabitant cannot alter or vitiate this right.

A large number of other courts and jurisdictions have reached this conclusion.

> It is well settled that a search conducted pursuant to voluntarily obtained consent comes within an exception to the general warrant requirement of the [F]ourth [A]mendment. *Schneckloth v. Bustamonte*, [supra]. It is equally well settled that a third person, other than the defendant, can consent to a search of a defendant's premises or effects if that third person has common authority over the premises or effects. [*Matlock*, supra]. *Matlock did not depend on the defendant's absence for the defendant there had just been arrested in the front yard of the residence when the third person's consent to search was procured.*

(Emphasis supplied.) *United States v. Sumlin.*[48] See also *J. L. Foti Constr. Co. v. Donovan.*[49]

In addition, as stated in *People v. Cosme*[50]:

> an individual who possesses the requisite degree of control over specific premises is vested in his own right with the authority to permit an official inspection of such premises and that this authority is not circumscribed by any "reasonable expectation of privacy" belonging to co-occupants. Whether the principle is characterized as an "assumption of risk" or a relinquishment of the "expectation of privacy" guaranteed by the Fourth Amendment, the fact remains that where an individual shares with others common authority over premises or property, he has no right to prevent a search in the face of the knowing and voluntary consent of a co-occupant with equal authority. It then follows that such an individual has no constitutional ground for complaint, in the absence of some other taint arising in connection with the search, when evidence obtained in the search is sought to be used against him in a subsequent criminal proceeding.

Id. at 292.

---

[48] *United States v. Sumlin*, 567 F2d 684, 687 (6th Cir. 1977), cert. denied, 435 U. S. 932 (98 SC 1507, 55 LE2d 529) (1978).
[49] *J. L. Foti Constr. Co. v. Donovan*, 786 F2d 714 (6th Cir. 1986).
[50] *People v. Cosme*, 48 N.Y.2d 286 (397 NE2d 1319) (1979).

A co-occupant's presence or absence at the time of another co-occupant's consent to search raises a distinction without a constitutional difference where the expectation of privacy has been relinquished.

> The holding of *Matlock* [, supra,] focused on whether or not the "permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." [Id. at 171.] The rationale behind this rule is that a joint occupant assumes the risk of his co-occupant exposing their common private areas to such a search. Id. at 171 n. 7. See *United States v. Solimine*;[51] *United States v. Canada*;[52] *Kirvelaitis v. Gray*.[53] *There is no reasonable expectation of privacy to be protected under such circumstances. We cannot see how the additional fact of Appellant's . . . refusal to consent in any way lessened the risk assumed that his co-occupant would consent. This additional fact does not increase a reasonable expectation of privacy.*

(Emphasis supplied.) *Sumlin*, supra at 688.

> Anyone who "possesse(s) common authority over or other sufficient relationship to the premises or effects sought to be inspected" may consent to the search of another's property. [*Matlock*, supra at 171]. . . . *Matlock*'s third-party consent rule applies even when a present subject of the search objects. See, e.g., *United States v. Donlin*;[54] *United States v. Childs*;[55] *J. L. Foti Constr. Co.* [, supra at 717]; *Donovan v. A. A. Beiro Constr. Co.*;[56] *United States v. Baldwin*;[57] *United States v. Bethea*.[58]

*Lenz*, supra.

---

[51] *United States v. Solimine*, 536 F2d 703, 707-708 (6th Cir. 1976), vacated on other grounds, 429 U. S. 990 (97 SC 517, 50 LE2d 603) (1976), reaff'd as modified, 551 F2d 124 (6th Cir. 1977).

[52] *United States v. Canada*, 527 F2d 1374, 1379 (9th Cir. 1975), cert. denied, 429 U. S. 867 (97 SC 177, 50 LE2d 147) (1976).

[53] *Kirvelaitis v. Gray*, 513 F2d 213, 215 (6th Cir.), cert. denied, 423 U. S. 855 (96 SC 103, 46 LE2d 80) (1975).

[54] *United States v. Donlin*, 982 F2d 31, 33 (1st Cir. 1992).

[55] *United States v. Childs*, 944 F2d 491, 495 (9th Cir. 1991).

[56] *Donovan v. A. A. Beiro Constr. Co.*, 746 F2d 894, 899, n. 4 (D.C. Cir. 1984).

[57] *United States v. Baldwin*, 644 F2d 381, 383 (5th Cir. 1981).

[58] *United States v. Bethea*, 598 F2d 331, 335 (4th Cir.), cert. denied, 444 U. S. 860 (100 SC 124, 62 LE2d 81) (1979).

As stated in *United States v. Shelton*,[59] "the Fourth Amendment does not protect 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.' "

The analyses of the majority opinion and special concurrence in this case are flawed for two main reasons: (1) they misconstrue the analysis in *Matlock* and (2) they conflate two separate elements in the Fourth Amendment jurisprudence at play here — the waiver of an expectation of privacy to a co-occupant and the effect of that waiver on the waiving individual's right to refuse a search of a shared premises consented to by a co-occupant. Each of these points will be considered in turn.

The special concurrence mischaracterizes the holding in *Matlock*, as standing for the proposition that one co-occupant can only consent to a search against another co-occupant who is absent from the scene. Contrary to the special concurrence, *Matlock* was *not* a case where the complaining co-occupant was absent. Matlock was *on the premises*, and despite their knowledge of his dominion over the searched property, the police chose not to seek Matlock's permission to search. In spite of Matlock's presence, the Supreme Court still found that the search was proper.

The special concurrence establishes an exigent circumstance requirement for valid consent from a co-occupant in Georgia. This would result in a different application of the Fourth Amendment in Georgia than in the federal courts or in the courts of other states. Under the Fourth Amendment, there are two general exceptions to a warrantless search: (1) valid consent and (2) exigent circumstances. If one exception exists, it is generally irrelevant to the validity of the search whether the other one also exists.

The requirement that a spousal consent to search is valid only if an exigent circumstance also exists merges two independent authorizations for a search. If an exigent circumstance exists, there is no need for consent from either spouse. On analysis, the special concurrence's position effectively establishes that one spouse cannot validly consent to the search of the marital home, if the other spouse is present and refuses the request to search. In other words, either spouse could effectively veto the valid consent to search of the other, absent the existence of an exigent circumstance. The Fourth Amendment requires a valid consent or the existence of an exigent circumstance to support a warrantless search of a marital abode. While not applicable here, the authority to consent to a warrantless search of a marital abode is not even limited to the parties to the marriage.

Despite persuasive federal cases from the First, Fourth, Fifth,

---

[59] *United States v. Shelton*, 337 F3d 529, 537 (5th Cir. 2003).

Sixth, Ninth, Tenth, Eleventh, and District of Columbia Circuits which are *directly on point* in this matter and state the *opposite* conclusion,[60] the majority opinion states: "*Matlock* and its progeny stand for the proposition that, in the absence of evidence to the contrary, there is a presumption that a co-occupant has waived his right of privacy as to other co-occupants. However, when police are confronted with an unequivocal assertion of that co-occupant's Fourth Amendment right, such presumption cannot stand."

The majority espouses a bright-line rule that, when a present co-occupant unequivocally objects to a search, police should be required to obtain a warrant even if another co-occupant has agreed to the search. In reaching this conclusion, the majority conflates two factors which must be considered separately in analyzing these cases: (1) an individual's waiver of his expectation of privacy and (2) the effect of such waiver on the waiving individual's subsequent right to refuse a search consented to by a co-occupant of a shared premises.

The analysis of *Matlock* and its progeny is based on the acquiescence of the defendant co-occupant to the mutual use of certain property with a second co-occupant. By agreeing to the mutual use of his property, the defendant co-occupant waives his Fourth Amendment expectation of privacy concerning the shared property with regard to the second co-occupant and directly assumes the risk that the second co-occupant, exercising his dominion over the property, might allow others to search it. Following such waiver, the second co-occupant, *in his own right and irrespective of the rights of his other co-occupants*, has the authority to permit an inspection of the shared area.

Contrary to the majority, one cannot summarily eliminate the authority of the co-occupant to consent to the search without first eliminating the waiver. Once the first co-occupant waives his expectation of privacy with regard to the second co-occupant by sharing dominion over certain property, he cannot regain that expectation of privacy and trump the resulting authority of the second co-occupant to allow a search *in his own right* simply by being present at the time the second co-occupant is asked to consent to a search. This is true because the resulting authority of the second co-occupant cannot be removed unless and until the causative sharing of dominion over property has ceased. "A defendant cannot expect sole exclusionary authority unless he lives alone, or at least has a special and private space within the joint residence." *Morning,* supra at 536. Accordingly, cases such as *Montero v. State,*[61] in which a single individual

---

[60] See, e.g., *Donlin,* supra; *Bethea,* supra; *Baldwin,* supra; *Sumlin,* supra; *Childs,* supra; *United States v. Rith,* 164 F3d 1323 (10th Cir. 1999); *Lenz,* supra; *Donovan,* supra. It does not appear that this question has been directly faced in any of the remaining circuits.

[61] *Montero v. State,* 245 Ga. App. 181 (537 SE2d 429) (2000).

who has not shared dominion over his property and later withdraws his consent to search, have absolutely no relevance to the matter now before us.

The majority provides that, absent exigent circumstances, a warrant must be sought when a co-occupant is present and objecting, but not when one co-occupant is simply absent when the consent to search is given by another co-occupant. Under this theory, Randolph's right to thwart a co-occupant's authorized search is based on his presence at the time of the search rather than his expectation of privacy. If a defendant's right to be free from an unreasonable search is based on an underlying expectation of privacy, then his presence or absence is irrelevant. The argument of the majority, in fact, involves asserting a right that has previously been waived. This Court lacks the authority to restrict United States Supreme Court precedent in this way.

And, even if one were to accept this bright-line rule requiring a warrant, one must then question what purpose it would serve. For example, under the very facts of this case, would the reviewing magistrate have any authority to disregard *Matlock*'s clear holding that any co-occupant "has the right to permit the inspection *in his own right*," *Matlock*, supra at 171, n. 7, and deny the warrant? The answer, of course, is "no." As such, the bright-line rule of the majority serves only to delay the inevitable by complicating the search and seizure law and procedure and has no real effect on the fundamental rights of the parties involved.

Furthermore, the majority's analysis, which relies upon the concept of one spouse improperly waiving the rights of the other, does not comport with the current state of the law. This problem is illustrated by *People v. Jackson*,[62] in which a New York court, citing *Cosme*, supra, held that a wife could consent to a search of personal effects of her husband not exposed to public view. In doing so, the court rejected earlier New York cases which adopted the analysis espoused by the majority. The court found:

> As Professor LaFave notes, it is doubtful whether the approach followed in [earlier cases] is consistent with more recent Fourth Amendment jurisprudence, since [that approach] relies upon a theory of one spouse waiving the other's constitutional rights, as opposed to the "common authority" rationale adopted by the Supreme Court in *Matlock*[,] supra. LaFave observes: "(T)he mere fact that a certain object may be characterized as a 'personal effect' does

---

[62] *People v. Jackson*, 170 Misc.2d 478 (649 NYS2d 334) (Crim. Ct. 1996).

not compel the conclusion that no risk is assumed by leaving that object in premises also occupied by a spouse[.] . . . "(T)he question is not whether the object seized was a personal effect of the nonconsenting spouse, but rather whether the object was kept in a place devoted to his exclusive use." 3 LaFave, Search and Seizure § 8.4 [a], at 761 (3d ed).

(Punctuation omitted.) Id. at 481.

Based on this observation, the *Jackson* court held:

[T]his court presumes that Ms. Scipio had authority to consent to a search of defendant's dresser drawer. Although Ms. Scipio indicated that the drawer in which the guns were found was used by defendant, the unlocked drawer was in a dresser located in defendant and Ms. Scipio's bedroom. Ms. Scipio used one of the drawers in the same dresser. Defendant did not adduce any evidence that he had exclusive control over the top drawer or that his use of two of the three dresser drawers was anything other than a practical arrangement commonly agreed to by married persons. (*See,* 3 LaFave, Search and Seizure § 8.4 [a], at 762 (3d ed) ("Under the *Matlock* assumption of risk approach, the requisite exclusive use is not established by the mere fact that only the other spouse had heretofore made it a practice to use the particular area searched; something more specific by way of a showing that the consenting spouse was denied access is required").) Without such evidence, defendant has failed to rebut the presumption of mutual authority and the court finds that Ms. Scipio lawfully could consent to a search of defendant's dresser drawer.

(Footnote omitted.) Id. at 483-484.

In support of its conclusion, the majority cites three cases, each of which is outdated, totally distinguishable, or otherwise problematic. First, the majority cites *State v. Leach.*[63] As an initial matter, *Leach* misstates the holding of *Matlock*, purporting that the Supreme Court ruled: "the consent of one who possesses common authority over premises or effects is valid against the absent, nonconsenting person with whom that authority is shared." (Punctuation and emphasis omitted.) Id. at 739. As noted above, this was, without question, not the holding of *Matlock*, as the defendant there was present at the time of the search. Thus, *Leach* is fundamentally flawed. Moreover, in reaching its conclusion, *Leach* relies almost

---

[63] *State v. Leach,* 113 Wash.2d 735 (782 P2d 1035) (1989).

exclusively on precedent pre-dating the decision in *Matlock*. And, finally, *Leach* is completely distinguishable from the current matter because, unlike the case now before us, the defendant in *Leach* did not object to the search in question. Id. at 738.

The majority also cites Florida law to support its position. The law in that state which is applicable here can be traced to *Silva v. State*.[64] In *Silva*, the Florida Supreme Court considered the validity of a search of a closet in a home after the wife consented to the search and her husband, who was present, objected to the search. Although it ultimately held that the wife had no common authority over the closet in question and, therefore, could not assent to its search, the Florida court opined:

> It is only reasonable that the person whose property is the object of a search should have controlling authority to refuse consent. His rights are personal to him and derive from the United States Constitution. Though a joint occupant should have authority to consent to a search of jointly held premises if the other party is unavailable, a present, objecting party should not have his constitutional rights ignored because of a leasehold or other property interest shared with another. This is particularly true where the police are aware that the person objecting is the one whose constitutional rights are at stake.

(Citation omitted.) Id. at 562-563.

The viability of the Florida court's conclusion, however, is drawn into serious question for two reasons. First, the Florida court misstates the facts of *Matlock*, supra, and purports that the defendant in that case was absent when consent was requested from his co-habitant to search. That, of course, was simply not the case. Second, in reaching its conclusion, the Florida court relies exclusively on cases pre-dating the decision in *Matlock*, all of which are, themselves, of questionable authority in light of the *Matlock* opinion. In essence, the entirety of *Silva*'s analysis directly relies on outdated precedent.

The majority also cites *In the Matter of the Welfare of D. A. G.*[65] to support its proposition. In that case, however, the court specifically noted: "We do not . . . decide what the result would be where both consenting and non-consenting joint occupants are present when the police request permission to search a premises." Id. at 790. Therefore, *D. A. G.* has no application here.

---

[64] *Silva v. State*, 344 S2d 559 (Fla. 1977).
[65] *In the Matter of the Welfare of D. A. G.*, 484 NW2d 787 (Minn. 1992).

Finally, contrary to the majority, our charge is to follow the United States Supreme Court on federal constitutional issues, not expand such holdings. We must apply the law as it actually stands, not the law as we aspire it to be. Where either the Georgia constitutional or statutory law provides greater protection for Georgia citizens than does the Federal Constitution, the greater protection will be enforced. There is no such greater protection provided under Georgia law in this case.

Turning to the case now before us, the material facts are not in dispute. On July 6, 2001, Scott Randolph and his wife, Janet, were living together in their marital home. That morning, Janet called police to report a domestic disturbance, and, when officers responded to her home, she told them that Scott had absconded with their child. She also complained that her husband had been causing marital and financial problems by abusing cocaine. A few minutes later, Scott returned home and told the officers that he was afraid that Janet was going to take their child away with her to her family in Canada. Scott stated that, for that reason, he had taken his child to a neighbor's home.

The officers then retrieved the Randolphs' child and returned to the marital home. Janet repeated her complaints about her husband's cocaine use, and one of the police officers confronted Scott about her accusations. The police officer asked Scott if he could search the premises, and Scott refused to consent. The police officer then asked Janet if he could search, and she consented. Janet then personally led the police officer into the marital bedroom where he discovered a piece of a drinking straw coated with cocaine residue. The police officer then left the residence to retrieve an evidence bag from his vehicle. When he returned, Janet, after a discussion with her husband, decided to withdraw her consent to search. The police officer collected the contraband he had seen earlier and escorted Scott and Janet to the police station. The police officer subsequently obtained a warrant to further search the home. During the later search, approximately 25 additional drug-related items were seized.

Later, Scott Randolph filed a motion to suppress the evidence discovered in his home, contending that, because he had refused to consent to a search, his Fourth Amendment right to privacy had been violated when police officers searched his home based on the consent of his wife. Scott further argued that all drug-related items found in the second search of his home were "fruits of the poisonous tree." The trial court denied the motion to suppress, and Scott Randolph now appeals this ruling.

The only question in this case, just as in *Matlock,* supra, is whether Scott's wife was "a third party who possessed common authority over or other sufficient relationship to the premises or

effects sought to be inspected." Id. at 171. Here, that question must be answered affirmatively. Janet shared full dominion over the marital household with her husband and the bedroom in which the contraband was discovered. Accordingly, Scott clearly assumed the risk that his wife would consent to the search of the home, and, as such, his Fourth Amendment rights to privacy were not violated when his wife gave such consent.

Thus, for the reasons set forth above, I believe that the trial court properly denied Scott Randolph's motion to suppress, and I therefore dissent.

I am authorized to state that Presiding Judge Andrews joins in this dissent.

DECIDED DECEMBER 1, 2003 — 

*Collier & Gamble, Wilbur T. Gamble III*, for appellant.
*Cecilia M. Cooper, District Attorney, Richard E. Thomas*, for appellee.